[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1091 
Albert Clarence Washington was convicted of rape in the second degree, a violation of § 13A-6-62(a)(1), Code of Alabama 1975. He was sentenced to four years' imprisonment, with one year to be served in the penitentiary and three years to be served on probation. He raises six issues on this appeal of his conviction.
 I
Prior to trial, Washington, an indigent, requested that his appointed counsel withdraw due to an alleged conflict of interest. He then informed the court that he desired to represent himself, and the following occurred in open court:
 "THE COURT: Mr. Washington, as I understand it, you want to represent yourself?
"MR. WASHINGTON: That's correct.
 "THE COURT: Mr. Poole filed a motion to withdraw. I want to make sure you understand that he is a State-appointed attorney. If you want him to sit and assist you and advise you or anything like that, I would be glad to order he do that. If you want to represent yourself, you can represent yourself.
"MR. WASHINGTON: I want to represent myself.
 "THE COURT: Do you understand that in a criminal trial there are certain rules you have to go by, certain ways you have to cross-examine witnesses, certain matters, and certain procedures, and you're not a lawyer.
"MR. WASHINGTON: No, sir.
 "THE COURT: You might need the advice of someone. If you want the advice of someone, I will make that available to you. But if you want to represent yourself, that's fine. I do not recommend that you represent yourself. I think by representing yourself in a case, you're placing yourself at an extreme disadvantage. Mr. Watkins [district attorney] has been trying cases for over twenty-five years, and you've never tried one.
"MR. WASHINGTON: I've tried three.
 "THE COURT: If you want to represent yourself, you can. I just want to make sure you understand what you're doing.
"MR. WASHINGTON: Yes, sir.
 "THE COURT: Do you want Mr. Poole to aid and assist you or do you want me to relieve him or what?
"MR. WASHINGTON: I want you to relieve him.
"THE COURT: You want me to let him out?
"MR. WASHINGTON: Right.
 "THE COURT: So, you want to proceed to trial by yourself. You say you've tried three other cases, and you feel comfortable in trying this.
 "You filed a motion here for me to recuse myself. Do you want to be heard on that motion?
"MR. WASHINGTON: Yes, sir, Your Honor.
 "THE COURT: All right. Why do you say I should recuse myself?
 "MR. WASHINGTON: Well, just past rumors and things that a person representing himself before you couldn't possibly get a fair trial. And in the case of —
 "THE COURT: What are you saying? That someone representing themself couldn't get a fair trial?
 "MR. WASHINGTON: It's been stated before that maybe you're prejudice and bias to a person.
 "THE COURT: Are you referring to a statement of — What was his name?
"MR. WASHINGTON: Curtis — *Page 1092 
"THE COURT: Curtis Lockett?
"MR. WASHINGTON: Right.
 "THE COURT: I never said that. You know Curtis Lockett as well as I do. He's about half crazy.
 "MR. WASHINGTON: Well, Your Honor, if you feel like you not going to be prejudice — I just want to bring out that.
 "THE COURT: You can represent yourself as long as you want to. What I'm saying is I do not recommend it. But if you want to represent yourself, fine. I never told Curtis Lockett the things he claims in the pleading he filed. I never told him that. I have nothing against you, I have nothing against anybody who represents themselves. It's just that I don't recommend it. But if you understand it, you have that right, and you can represent yourself.
 "MR. WASHINGTON: Yes, sir. I want to represent myself. I filed that motion because, like I said, it was rumor. I have nothing more than rumor beyond the fact of the petition he filed for you to remove yourself. And the reason he stated.
 "THE COURT: If that's what you're going on, based on what Mr. Lockett filed in a civil case a while back. I did not tell Mr. Lockett that. I told him he probably needed to get an attorney if he could afford one. You don't have to have one if you don't want one. In your case, the State will pay the fee of an attorney if you want one. If you don't want one, you don't have to have one.
 "MR. WASHINGTON: I don't want one. "THE COURT: Okay. I'm going to deny your motion to remove myself based on this if that's all you've got.
 "This case will be docketed for trial. Have you asked that any witnesses be subpoenaed?
"MR. WASHINGTON: Right. I filed notice."
The defendant was allowed to proceed pro se. He now maintains that the trial court failed to conduct an adequate inquiry, in compliance with Von Moltke v. Gillies, 332 U.S. 708,68 S.Ct. 316, 92 L.Ed. 309 (1948), to determine whether he knowingly and intelligently waived his right to counsel. He also contends that the court erred when, during the trial, he claimed that he was incompetent to represent himself, moved for a mistrial, and the court denied his motion.
 A. Von Moltke emphasized the "protecting duty" on the part of the trial judge to insure a valid waiver of the right to counsel. 332 U.S. at 723, 68 S.Ct. at 323. Justice Black's plurality opinion noted:
 "[A] judge must investigate as long and as thoroughly as the circumstances of the case before him demand. . . . To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." 332 U.S. at 723-24, 68 S.Ct. at 323.
"No court has ever apparently gone so far as to require that Justice Black's lengthy litany of questions [in Von Moltke] be followed to the letter. . . ." United States v. Bailey,675 F.2d 1292, 1299 (D.C. Cir.), cert. denied, 459 U.S. 853,103 S.Ct. 119, 74 L.Ed.2d 104 (1982).
 "Perhaps because the Von Moltke opinion reflected only a plurality position, lower courts generally have rejected the view 'that a waiver, to be [constitutionally] valid, must emerge from a colloquy between trial judge and defendant covering every factor specified by Justice Black.' They 'have perceived his list as a catalog of concerns for trial court consideration,' rather than 'as a prescribed litany of questions and answers leading to mandatory reversal in the event that one or more is omitted.' The lower courts have frequently noted that an 'in-depth inquiry' covering all of the items specified in Von Moltke is to be 'preferred,' but they have also upheld waivers in cases involving very limited inquiries. The critical issue, it has been noted, 'is *Page 1093 
what the defendant understood — not what the court said.' Consideration must be given to all of the surrounding circumstances, including not only the statements of the trial judge and defendant, but also the defendant's age, mental condition, and prior experience with the criminal process, previous hearings in the case, and the general nature of the offense charged. Each factor will have a bearing on the other. Where 'the background and experience of the defendant on legal matters [is] apparent from the record,' the waiver may be sustained notwithstanding an almost complete failure of the trial judge to explore the Von Moltke factors." W. LaFave J. Israel, 2 Criminal Procedure § 11.3 at 31-33 (1984) (brackets in original) (footnotes omitted).
While the trial court must scrupulously protect a defendant's right to counsel, he must also respect the right of the accused to conduct his own defense. In Faretta v.California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, (1975), the Court recognized a constitutional right to self-representation and held that a lawyer may not be forced upon an accused who desires to proceed pro se. The Court required, however, that the defendant "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " 422 U.S. at 835,95 S.Ct. at 2541 (quoting Adams v. United States ex rel. McCann,317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). See also Fordv. State, 515 So.2d 34 (Ala.Cr.App. 1986), aff'd, Ex parteFord, 515 So.2d 48 (Ala. 1987).
"[W]hile it is preferred that the trial court inform the defendant (and inquire into his understanding) as to each of the Von Moltke factors, that procedure is not viewed as aconstitutional necessity. Arguably, Faretta suggests otherwise as to informing the defendant of the pitfalls of self-representation." LaFave Israel, 2 Criminal Procedure § 11.5 at 46 (emphasis added).
In the case before us, the record as a whole demonstrates that, having been warned of the dangers of proceeding without an attorney, the defendant knowingly and intelligently waived his right to counsel. As in Faretta, the trial judge here informed the defendant "that he thought it was a mistake not to accept the assistance of counsel, and that [he] would be required to follow all the 'ground rules' of trial procedure."422 U.S. at 835-36, 95 S.Ct. at 2541. He also warned the defendant that the prosecution would be represented by an experienced attorney, see People v. Lopez, 71 Cal.App.3d 568,138 Cal.Rptr. 36, 39 (1977), and that he (the defendant) had never tried a case, to which the defendant replied, "I've tried three."
Although the trial judge made no specific inquiry regarding the defendant's background or education, the record affirmatively shows that the defendant was "literate, competent, and understanding." Faretta, 422 U.S. at 835,95 S.Ct. at 2541. After discharging his appointed attorney, the defendant filed a motion for continuance, a motion for the judge's recusal, a notice of alibi defense, and a motion to suppress evidence. The filing of these documents indicates that the defendant was literate, able to communicate, and possessed "considerable understanding of the legal system." Wiggins v.Procunier, 753 F.2d 1318, 1320 (5th Cir. 1985).
Evaluating all the circumstances of the case, we find that the trial court's warning to the defendant was sufficient, that his inquiry into the defendant's waiver of counsel was adequate, and that his determination to allow the defendant to proceed pro se was not error.
 B.
The defendant next argues that the court erred by denying his motion for mistrial when, after the trial was in progress, the defendant claimed that the case was "too complicated," that he was "not competent to handle" it, and that a "crucial witness" was not present. The denial of this motion was also not error. *Page 1094 
The absence of a "crucial witness" was not grounds for a mistrial. The missing witness was the defendant's sister, who was, as the trial court explained to the defendant before trial, beyond the State's subpoena power. Although the defendant contends that she would have completed his alibi for him, three other alibi witnesses testified and the sister's testimony would have been merely cumulative.
The remaining grounds for the mistrial motion, that the case was "too complicated" and the defendant "incompetent to handle" it, graphically illustrate a trial court's dilemma when confronted with a defendant who desires to represent himself. Had the court not found him competent to conduct his own defense, the defendant would, no doubt, now be arguing that he was prevented from exercising his constitutional rights as announced in Faretta. Instead, he is arguing that the court's decision to allow him to proceed pro se was in error. "Whichever way the trial judge decides, his decision is subject to challenge." Pickens v. State, 96 Wis.2d 549, 292 N.W.2d 601,605 (1980).
The facts of Pickens, supra, closely parallel the case before us. After Pickens was allowed to represent himself and the trial was underway, he asked to withdraw his waiver of counsel. Like the trial judge here, the trial judge in Pickens responded that defendant "had made his election and was bound by it."96 Wis.2d at 570, 292 N.W.2d at 612. The Wisconsin Supreme Court observed the following:
 "[T]he trial court has a continuing responsibility to watch over the defendant and insure that his incompetence is not allowed to substitute for the obligation of the state to prove its case. If, during the course of the trial, it becomes apparent that the defendant is simply incapable, because of an inability to communicate or because of a complete lack of understanding, to present a defense that is at least prima facie valid, the trial court should step in and assign counsel. But because the defendant is not to be granted a second chance simply because the first is going badly, counsel should be appointed after trial has begun, or a mistrial ordered, only where it appears the defendant should not have been allowed to proceed pro se in the first place." Id., 96 Wis.2d at 568, 292 N.W.2d at 611 (emphasis added).
Here the defendant was not "simply incapable, because of an inability to communicate or because of a complete lack of understanding, [of] present[ing] a defense that [was] at least prima facie valid." The defendant cross-examined the State's witnesses, objected to the State's evidence, and called numerous witnesses in his own behalf. He presented three alibi witnesses, including a police officer, whose testimony, if believed by the jury, could conceivably have resulted in an acquittal. The defendant's conduct of his own defense did not, therefore, make it appear that he "should not have been allowed to proceed pro se in the first place," and the motion for mistrial was properly denied.
 II
The defendant argues that the court erred in denying his motion for new trial based on the failure of two jurors to respond to voir dire questions.
The defendant asked the following question of the venire: "Are any of you close friends to the District Attorney, kin to him or owe him a favor maybe or anything that would influence you to support his charge?" No juror responded. The defendant alleges that during the voir dire for another case the next day, Mr. A.G. Westbrook, who served on the defendant's jury, responded that he was a friend of the District Attorney.
Prior to the defendant's trial, the court asked the following question of the venire: "Mr. Wade Drinkard is the Assistant District Attorney for Marengo County. Is anyone related by blood or marriage to Mr. Drinkard?" There was no response. The defendant alleges that the following day, Venireman Raymond Vick, who served on the defendant's jury, replied that he was a distant relative of Drinkard's. According to the defendant, the trial court then determined that Mr. Vick's relationship to the *Page 1095 
Assistant District Attorney was not within the prohibited degrees of affinity or consanguinity. The defendant contends that had he known Mr. Westbrook was a friend of the District Attorney and Mr. Vick "considered himself kin" to the Assistant District Attorney, he would have struck both veniremen.
Although the defendant introduced a portion of the court reporter's transcript to substantiate what occurred during the voir dire at his trial, he presented no evidence, other than his own unsupported allegations, of what occurred during the voir dire in the other case the next day. Neither Mr. Westbrook nor Mr. Vick testified. The same trial judge evidently presided over the "other case," because at the hearing on the motion for new trial, the judge made the following findings:
 "The court, after hearing the evidence and arguments on the motion for a new trial finds that the grounds for a motion for a new trial are not factually supported by competent evidence or legal evidence. Further I find that some of the testimony of Mr. Washington is not factually correct as to the responses by jurors in subsequent cases. It is my recollection that Mr. Westbrook stated that he knew Mr. Watkins, he knew him and served on a previous jury in a prior case. That was the response that Mr. Westbrook gave at a later time, that he had served on a previous case and he knew Mr. Watkins from serving on the case. The response of Mr. Vick I don't think was appropriate either as related by Mr. Washington."
Based on the judge's recollection that Mr. Westbrook stated in another trial that he "knew [District Attorney] Watkins from serving on [a previous] case," the court's finding that this juror did not withhold information from the defendant during voir dire was not error. The defendant's voir dire question was whether any member of the venire was "close friends . . . or kin" to the prosecutor or "owe[d] him a favor." The voir dire question in the other proceeding was apparently whether any prospective juror merely "knew" the District Attorney. Compare Richardson v. State, 507 So.2d 1362,1364 (Ala.Cr.App. 1987) (juror who had formerly worked with employee of prosecutor's office "did no wrong in not responding" to question whether she had a "close friend" or "neighbor" in law enforcement). "In view of the narrowed scope of the question as posed, we can find no reversible error. . . ." Estes Health Care Centers, Inc. v. Bannerman, 411 So.2d 109,112 (Ala. 1982).
The trial court made no specific finding with respect to Mr. Vick's response in the other proceeding, noting only that Vick's answer as related by the defendant was not "appropriate." Even taking the defendant's allegations as true, however, the failure of Mr. Vick to disclose a distant relationship to the assistant district attorney does not entitle the defendant to a new trial. It is not "any failure ofany prospective juror to respond properly to any questionregardless of the excuse or circumstances [that] automatically entitles a party to a new trial or reversal of the cause on appeal." Freeman v. Hall, 286 Ala. 161, 166, 238 So.2d 330
(1970) (emphasis in original). "[T]he proper inquiry for the trial court on motion for new trial, grounded on allegedly improper responses or lack of responses by prospective jurors on voir dire, is whether this has resulted in probable prejudice to the movant." Id. See Ex parte O'Leary,438 So.2d 1372, 1375 (Ala. 1983) (failure of jury foreman to disclose prior jury service on another marijuana case resulted in probable prejudice); Ex parte Poole, 497 So.2d 537, 542
(Ala. 1986) (failure of two jurors to disclose, during trial of law enforcement officer for manslaughter, their previous convictions in response to question regarding "problems or conflicts with any law enforcement officer" resulted in probable prejudice); Ex parte Ledbetter, 404 So.2d 731, 732,734 (Ala. 1981) (failure of former deputy sheriff to disclose that he had been the "victim of any sort of criminal activity" resulted in probable prejudice).
If the trial court determined, as the defendant alleged, that Mr. Vick's relationship to the assistant prosecutor was so *Page 1096 
distant as not to fall within the degrees of affinity or consanguinity barred by statute, it is likely that at defendant's trial on April 20, when Vick first heard the question regarding kinship with the assistant State's attorney, the relationship did not even occur to him. His positive response to the same question on April 21 could have been prompted by further, overnight reflection and was not indicative of an earlier intentional withholding of information. The defendant presented no evidence of Vick's willful failure to respond.
 "Although the factors upon which the trial court's determination of prejudice is made must necessarily vary from case to case, some of the factors which other courts have considered pertinent are: temporal remoteness of the matter inquired about, the ambiguity of the question propounded, the prospective juror's inadvertence or willfulness in falsifying or failing to answer, the failure of the juror to recollect, and the materiality of the matter inquired about." Freeman v. Hall, 286 Ala. at 167, 238 So.2d at 336
(emphasis added).
The nature of Vick's withheld information was also not highly material here. Even assuming his relationship to Assistant District Attorney Drinkard (the degree of which was not established by defendant's evidence), Vick was unlikely to have been swayed by such a kinship, since Drinkard did not try the case or, for aught that appears, participate in any manner. Compare Wallace v. Campbell, 475 So.2d 521, 522 (Ala. 1985) (probable prejudice where juror failed to disclose that she was related to sheriff "in an action against a local policeman when the sole issue litigated was the propriety of a high-speed automobile chase by a police officer seeking to make an arrest"); Estes Health Care Centers, Inc. v. Bannerman,411 So.2d at 112 (trial judge was justified in concluding that failure of jurors to respond that they had relatives in nursing homes did not, "in the context given, result in probable prejudice" to defendant nursing home). The defendant's motion for new trial on this ground was correctly denied.
 III
The defendant maintains that the court erred in not ordering the production of a trial transcript for his use in preparing for the hearing on his motion for new trial. He insists that since he was unaided by a lawyer at trial and had no transcript, he was unable to reconstruct from memory the trial errors which occurred and bring them to the court's attention on motion for new trial. Both the defendant and the State argue that Argo v. State, 42 Ala. App. 454, 168 So.2d 19, cert. denied, 277 Ala. 177, 168 So.2d 23 (1964), is controlling.
Though not directly on point, Argo supports the State's position here. In response to Argo's argument that he was entitled to a transcript prior to the hearing on his motion for new trial, the Court of Appeals held that counsel had waived the issue by not requesting a continuance of the hearing so that a transcript could be prepared. With the exception of the fact that Argo did not involve a pro se defendant, the remaining facts are parallel.
In the present case, the court appointed appellate counsel on June 22. Counsel filed a motion for new trial on July 7. According to appellant's brief, "The Motion for New Trial was set several times for hearing, but continued; it was finally heard on December 14, 1987. During the contacts with the court, undersigned counsel conveyed Washington's request that a transcript be prepared for use at the hearing on the Motion for New Trial." The record does not reflect any request, prior to the one made at the December 14 hearing itself, for a transcript or for a continuance. "This court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record." Moore v. State,457 So.2d 981, 989 (Ala.Cr.App. 1984).
Moreover, even if the matter had been properly brought to the trial court's attention, there was no error in denying the request for a transcript for use at the hearing on motion for new trial. "Section 12-22-190, Ala. Code 1975, authorizes a free transcript only for a convicted defendant *Page 1097 
for purposes of appeal." Mardis v. State, 423 So.2d 331, 333-34
(Ala.Cr.App. 1982). "[U]navoidable delays result from the volume of appellate cases which court reporters must prepare for appeal." Isom v. State, 497 So.2d 208, 213 (Ala.Cr.App. 1986). Cognizant of the delay that would result from postponing his decision on motion for new trial until a transcript was prepared, the trial judge was within his discretion in not ordering the preparation of the transcript prior to a hearing on the motion.
Finally, the lack of a transcript below could have prejudiced the defendant only if the alleged errors made the basis of his motion for new trial resulted in reversal on appeal. Compare Isom v. State, 497 So.2d at 214; Haynes v.State, 333 So.2d 214, 214 (Ala.Cr.App. 1976); Phillips v.State, 52 Ala. App. 297, 291 So.2d 751, 754 (1973).
 IV
The defendant insists that the trial court erred in overruling his motion to suppress, thereby allowing certain letters, allegedly from the defendant to the prosecutrix, into evidence. All of the letters are handwritten. None are signed. They begin with the salutation, "Dear Love," or other term of endearment, and end with a similar, but nameless, closing.
The prosecutrix testified that she and the defendant carried on a correspondence for several months prior to the sexual act resulting in this prosecution. She stated that she would write a letter to the defendant and give the letter to Janet Norwood or Kesha Washington to deliver to the defendant. Then, soon thereafter, she would receive a reply letter, delivered to her personally by Janet or Kesha, from the defendant.
Janet Norwood, the defendant's next-door neighbor, testified that she took letters from the prosecutrix, delivered them to the defendant personally, and then retrieved other letters from the dashboard of the defendant's truck parked in front of his residence, and gave those letters personally to the prosecutrix. Norwood testified that she got one letter for the prosecutrix "from [the defendant's] hands," but most of the letters came from the truck. She never saw the defendant write any of the letters but she "kn[e]w to look in his truck and get them." Kesha Washington testified to the same arrangement as an intermediary between the prosecutrix and the defendant. The defendant maintains that there was no evidence that he wrote the letters, and, without being properly authenticated, they were inadmissible.
"Before a letter is received in evidence, it is necessary to lay a foundation establishing its identity and authenticity, as by introducing proof as to the source of the letter or proof of the handwriting or signature of the sender." Howard v. State, 347 So.2d 574, 575 (Ala.Cr.App. 1977). Here, there was no proof regarding the defendant's handwriting and the letters bore no signature. Nevertheless, even "unsigned letters may be received in evidence if properly connected with a person as being his actual letter, by the introduction of competent evidence showing it to be so." Silvav. Exchange Nat'l Bank, 56 So.2d 332, 335-36 (Fla. 1951).
The question before us is whether the letters were "properly connected" with the defendant even though no witness saw him write the letters or place them in his truck for delivery. "The authenticity of a letter may be established in more than one way. It may be established directly by proof of handwriting or by indirect or circumstantial evidence."Casto v. Martin, 159 W. Va. 761, 230 S.E.2d 722, 727 (1976);Maynard v. Bailey, 85 W. Va. 679, 102 S.E. 480 (1920);Deaderick v. Deaderick, 182 Ga. 96, 185 S.E. 89 (1936).
In Deaderick v. Deaderick, supra, the court accepted circumstantial evidence as a guarantee of the authenticity of a letter. There, X wrote a letter to the plaintiff Wife revealing the Husband's misconduct. X also told the Husband that she had written the letter. On the same day the Wife received the letter, the Husband telephoned the Wife and told her to ignore the letter. The Georgia Supreme Court held that these facts were "sufficient to authorize admission *Page 1098 
of the letter in evidence over the objection that there was no proof of its genuineness." 182 Ga. 96, 185 S.E. at 90.
In the present case, although no witness saw the defendant write the letters, they were unsigned, and there was no proof of his handwriting, the testimony of the prosecutrix and the two delivery "go-betweens" provided sufficient circumstantial evidence to connect the defendant with the authorship of the writings under a theory analogous to "reply letters":
 "When a letter is received by due course of mail, purporting to come in answer from the person to whom a prior letter has been sent, there are furnished thereby, over and above mere contents showing knowledge of facts in general . . . three circumstances evidencing the letter's genuineness: First, the tenor of the letter as a reply to the first indicates a knowledge of the tenor of the first. Second, the habitual accuracy of the mails, in delivering a letter to the person addressed and to no other person . . . indicates that no other person was likely to have received the first letter and to have known its contents. Third, the time of the arrival, in due course, lessens the possibility that the letter, having been received by the right person but left unanswered, came subsequently into a different person's hands and was answered by him. To this may be added the empirical argument that in usual experience the answer to a letter is found in fact to come from the person originally addressed. . . ." 7 Wigmore, Evidence § 2153 at 752 (Chadbourn rev. 1978). See also C. Gamble, McElroy's Alabama Evidence § 322.01 at 709 (3d ed. 1977).
 Although the writings at issue here do not strictly comply with the requisites for reply letters, the reasons underlying the presumption of authenticity of such letters are present here. First, the prosecutrix's testimony established that the tenor of the letters she received was responsive to earlier letters she had written. Second, while all of the letters were delivered by intermediaries rather than by "due course of mail," the intermediaries testified that they handed all correspondence directly from the prosecutrix to the defendant and, on at least one instance, handed correspondence "from his hands" to the prosecutrix personally. The weak link in the intermediary system was, of course, the arrangement for retrieval of letters from the defendant's truck, but even this weak link constituted circumstantial evidence of the defendant's authorship of the letters.
 "Like any other material fact, the authenticity or genuineness of a letter may be established by circumstantial evidence. If its tenor, subject-matter, and the parties between whom it purports to have passed make it fairly fit into an admitted or proved course of correspondence and constitute an evident connecting link or part thereof, these circumstances justify its admission." Maynard v. Bailey, 85 W. Va. 679, 102 S.E. 480, 481-82 (1920).
 Third, "the time of arrival, in due course" of letters allegedly from the defendant "lessen[ed] the possibility" that the prosecutrix's earlier letters were received by the defendant but left unanswered, and "came subsequently into a different person's hands and [were] answered by him." 7 Wigmore, Evidence § 2153 at 752.
Finally, although "the mere contents of a written communication . . . are of themselves usually not sufficient evidence of genuineness," 7 Wigmore, Evidence § 2148 at 746, "[t]he contents of a writing may be critical in establishing admissibility. When the contents of a letter are of such nature that the letter could not have passed between any parties except the purported writer and the person to whom it was delivered, the letter is admissible." Casto v. Martin,230 S.E.2d at 727 (footnotes omitted). See also People v. Adams,162 Mich. 371, 127 N.W. 354, 360 (1910) (letters purporting to come from defendant to witness, referring to a subject previously discussed by them, were admissible although it was not shown that he signed or sent them).
In the present case, references in the letters to acts of the defendant which only he would be likely to know, a plea to the prosecutrix to drop the charges against *Page 1099 
him, and his introduction, on cross-examination of the prosecutrix, of a letter from her which he had in his possession, further served to authenticate the writings as his. State v. Huffman, 141 W. Va. 55, 87 S.E.2d 541 (W.Va. 1955).
In Huffman, the accused, a 45-year-old man charged with statutory rape of a 16-year-old girl, wrote letters to the prosecutrix while they were both in jail. The letters were delivered by an intermediary. The West Virginia court held the following:
 "The evidence supplied by the contents of the notes, the circumstances under which they were written and delivered to the prosecuting witness, her statements that she knew that one of them came from him, that he sent some notes to her which she had destroyed, and that the note which she wrote to him, introduced in evidence, on her cross examination, as Defendant's Exhibit No. 1, was an answer to a letter from him, sufficiently established his authorship of the notes and in the absence of any evidence to the contrary rendered them admissible in evidence.
 "When it appears that two notes were received by the prosecuting witness purporting to have been written by the defendant, one of which the prosecuting witness testified she knew was from him, one of which . . . referred to a charge of rape which she had recently made against him, the actual facts concerning which were exclusively within their knowledge, the other of which contained statements which indicate that it was written while they were confined in different parts of the same jail and requested an answer from her, and both of which, urging her not to testify against him . . . were written and delivered to the prosecuting witness within a short time after she had made the charge against him, the identity of the defendant, as the writer of the notes, is sufficiently established to render them admissible in evidence, at the instance of the State, upon the trial of an indictment against the defendant for the offense mentioned in one of the notes." 87 S.E.2d at 553-54.
The sufficiency of the predicate required for the authentication of letters is largely within the discretion of the trial judge, and will be reviewed only for an abuse of discretion. Casto v. Martin, 230 S.E.2d at 727; State v.Huffman, 87 S.E.2d at 554. We find no abuse of discretion here. The letters were properly admitted for the jury to determine their actual authorship. Maynard v. Bailey, 102 S.E. at 482.
 V
The defendant maintains that the prosecutor made several remarks disparaging him before the jury. For only one of these remarks, however, was there an even arguably proper objection interposed at trial. The others, therefore, are not preserved for our review, regardless of the fact that the defendant was proceeding pro se. "[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.' "Faretta v. California, 422 U.S. at 835 n. 46, 95 S.Ct. at 2541
n. 46.
During the direct examination of one of his character witnesses, defendant asked the question, "Do I try helping your children with any problems?" whereupon the following occurred:
 "MR. WATKINS [District Attorney]: Your Honor, this is questioning to build him up. He's built his straw man, and now he's tearing him down.
"THE COURT: Sustain.
"MR. WATKINS: We could be here for a week.
 "MR. WASHINGTON: I think the jury should also — I object on saying this; I know you sustained — I think the jury should know about my reputation.
"MR. WATKINS: You don't prove it that way.
 "THE COURT: The way you prove reputation, you may ask does she know your reputation in the community in which you live?
"MR. WATKINS: For what?
"THE COURT: For good character. *Page 1100 
"MR. WATKINS: General reputation for character."
The defendant argues that the prosecutor's comment, "We could be here for a week" was meant to imply that the trial could be unduly prolonged because the defendant was representing himself. In the context of the exchange, however, it is probable that the remark was meant to imply that questioning a character witness about specific instances of good conduct could result in a lengthy proceeding because, if such evidence were allowed, any accused (whether represented by counsel or not) could elicit numerous instances of his past good behavior. "[T]he only way in which character . . . can be proved is by evidence of reputation. This excludes evidence of specific acts or blameless life and rules out opinion evidence as to the character of the accused for the trait in question based on the witness' knowledge and observation." E. Cleary,McCormick on Evidence § 191 at 455-56 (2d ed. 1972). See generally C. Gamble, McElroy's Alabama Evidence § 27.01 (3d ed. 1977).
Under the circumstances, we do not consider the prosecutor's remark to have disparaged the defendant personally; it merely called the court's attention to the reason underlying the character evidence rule at issue.
 VI
The defendant contends that the victim was not a credible witness, that her testimony was coerced, that and his own alibi witnesses established his innocence. "This Court is not a trier of fact. The jury has already made [those] determination[s] and weighed the credibility of the witnesses." Mosley v. State, 461 So.2d 34, 36 (Ala.Cr.App. 1984).
 " ' . . . The weight of the evidence, the credibility of the witnesses, and inferences to be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone. Willcutt v. State, 284 Ala. 547, 226 So.2d 328 (1969).' Walker v. State, 416 So.2d 1083, 1089 (Ala.Cr.App. 1982). 'It was within the province of the jury to give the evidence in the case whatever weight and emphasis they thought proper in reaching their verdict.' Linson v. State, 394 So.2d 85, 92 (Ala.Cr.App. 1981). 'Where, as in this case, there is conflicting evidence presented by the prosecution and the defense, it is for the jury to resolve the conflict and determine the defendant's guilt or innocence. . . . In making its determination, the jury may believe or disbelieve all or any part of the testimony presented by either side.' Terry v. State, 424 So.2d 652, 655
(Ala.Cr.App. 1982).
 " 'Conflicting evidence always presents a question for the jury unless the evidence fails to establish a prima facie case. Starling v. State, 398 So.2d 337 (Ala.Cr.App.), cert. denied, Ex parte Starling, 398 So.2d 342 (Ala. 1981).' Gardner v. State, 440 So.2d 1136, 1137 (Ala.Cr.App. 1983). By the victim's testimony, the State established a prima facie case of [rape] in the [second] degree.
 " 'This Court will not interfere when the evidence is conflicting if there was material evidence tending to support the jury's verdict. "(T)he verdict settles any conflict in the evidence" and this Court will not invade the province of the jury. 24A C.J.S. Criminal Law § 1881 (1962).' Simmons v. State, 428 So.2d 218, 219
(Ala.Cr.App. 1983). 'Where there is evidence from which the jury may by fair inference find the defendant guilty, the trial court should submit the case to the jury to determine the weight it will give the evidence, and this Court should not disturb the verdict.' Giles v. State, 440 So.2d 1237, 1239 (Ala.Cr.App. 1983). 'Conflicting evidence is for the jury and a verdict rendered thereon will not be disturbed on appeal.' Crowell v. State, 389 So.2d 545, 548 (Ala.Cr.App. 1980)." Id.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur *Page 1101